IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIV. NO. 10-00200 JMS-RLP |
| | ) | |
| Plaintiff, | ) | AMENDED ORDER GRANTING |
| | ) | PLAINTIFF'S MOTION TO DISMISS |
| vs. | ) | OR STRIKE AND FOR SUMMARY |
| | ) | JUDGMENT |
| ONE HUNDRED THIRTY-THREE | ) | |
| (133) UNITED STATES POSTAL | ) | |
| SERVICE MONEY ORDERS | ) | |
| TOTALING $127,479.24 IN | ) | |
| UNITED STATES CURRENCY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| LIFE ENHANCEMENT | ) | |
| PRODUCTS, INC.; WILL BLOCK; | ) | |
| and SAMUEL KORNHAUSER, | ) | |
| | ) | |
| Claimants. | ) | |
| _____ | ) | |

## AMENDED ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS OR STRIKE AND FOR SUMMARY JUDGMENT[*]

## I.  INTRODUCTION

This is an action brought under the Civil Asset Forfeiture Reform Act

---

[*] The original Order [Doc. No. 63] granting the Motion contained a typographical error. This Amended Order withdraws that Order and corrects the last sentence of page 30 to read ". . . a constructive trust theory does not provide LEPI with an interest[.]"  In all other respects, this Amended Order is the same as the original Order.

of 2000 ("CAFRA"), 18 U.S.C. § 983, against 133 United States Postal Service ("USPS") money orders valued at $127,479.24 (the "Defendant Money Orders"). The Defendant Money Orders were seized *in rem* by Plaintiff United States ("Plaintiff" or "the Government") under 31 U.S.C. § 5317(c)(2). Plaintiff now moves under Rule G(8)(c) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") to strike the Claims and Answers of Claimants Life Enhancement Products, Inc. ("LEPI"), Will Block ("Block"), and Samuel Kornhauser ("Kornhauser") for lack of standing, and/or for summary judgment.[1] Further, if the Claims are struck, the Government seeks entry of summary judgment on the entire case, asserting it is otherwise undisputed that the Government is entitled to forfeit the Defendant Money Orders. For the reasons set forth, the Motion is GRANTED.

## II. BACKGROUND

### A. The Seizure of the Defendant Money Orders

On October 6, 2009, the United States Postal Inspection Service ("USPIS"), acting pursuant to warrant, seized the Defendant Money Orders from a Maui Post Office. *See* Pls.' Concise Statement of Facts ("CSF") (Doc. No. 31)

---

[1] Block is the President and Chief Executive Officer of LEPI. Doc. No. 39 at 1. Although Block made a Claim in this action, he withdrew it in response to the Government's Motion. *See* Doc. No. 46 at 1 n.1.

¶ 5.[2]  The Defendant Money Orders were in three parcels addressed to Richard

Smith ("Smith") at his post office box with a return address of "Gail Valentine

Jones, 1135 Makawao Ave. #250, Makawao, HI 96768, Calistoga, CA 94515"

(receipts indicated the parcels were in fact mailed from Phoenix, Arizona).  *Id.* ¶ 4.

       The seizure resulted from an ongoing USPIS investigation that began

in early 2008, after USPS employees reported seeing Smith meeting and making

exchanges with people in a Maui post office parking lot and then buying USPS

money orders with cash.  Compl. (Doc. No. 1) ¶ 7.

       When Smith tried to buy money orders with cash exceeding $3,000,

USPS employees advised him of United States Treasury Department requirements

and that he had to show personal identification.[3]  Smith then began buying money

orders with cash in amounts less than $3,000 -- often for $2,900.  He also began

buying multiple money orders for less than $3,000 at other Maui post offices on

the same day.  Doc. No. 31 ¶ 3.  From February 1, 2008 to December 12, 2008,

Smith purchased a total of 279 USPS money orders having a combined value of

---

[2]  Where a fact is not in dispute, the court cites directly to Plaintiff's CSF.

[3]  Under 31 U.S.C. § 5325 and 31 C.F.R. § 103.29 (effective prior to March 1, 2011), for purchases of instruments involving currency of $3,000 to $10,000 a "financial institution" -- including the USPS -- must verify a purchaser's identity and maintain a record of, among other information, the name, date, and amount of the purchase.  A contemporaneous purchase of instruments totaling $3,000 or more is treated as one purchase, as are multiple purchases during one business day totaling $3,000 or more.  Amounts greater than $10,000 are subject to currency transaction reporting requirements under 31 U.S.C. § 5313 and 31 C.F.R. § 103.22(b)(1).

$267,846.74.  The Defendant Money Orders are included within these 279 -- many that were not seized had apparently been cashed.  Doc. No. 31 ¶ 6; Doc. No. 1 ¶ 20.

The purchases were structured in a way to avoid reporting requirements; there were repeated instances where cash in amounts exceeding $3,000 was used to purchase money orders on consecutive days or within a few days so as not to be reportable.  Money orders were often purchased at different post offices so that the total amount of cash used on a single day exceeded $3,000.  Doc. No. 1 ¶ 18.  The pattern of making multiple cash purchases on the same or consecutive days, or over a short time span, is consistent with a scheme to avoid reporting requirements.  *Id.* ¶ 19.

On October 14, 2009 -- after the USPIS seized the three parcels before their delivery -- Smith contacted the USPS, inquiring as to their whereabouts but without mentioning their contents.  Doc. No. 1 ¶ 15.  On November 16, 2009, a postal inspector and Maui County police officers interviewed Smith.  Smith acknowledged that the parcels were mailed from Arizona and contained "a lot of money orders."  *Id.* ¶¶ 21(a) & (b).[4]

The Verified Complaint alleges that Smith explained to the USPIS

---

[4]  The record is unclear as to how the money orders Smith purchased on Maui got to Arizona, and why they were being mailed back to him on Maui.

that his friend Gail Valentine Jones ("Valentine") "had been involved in a civil lawsuit in which a judgment had been entered against her and he had suggested buying Postal Money Orders as a way to help her to hide her money from people involved in that civil lawsuit." *Id.* ¶ 21(c). Smith admitted he knew that buying money orders with amounts of cash over $3,000 triggered reporting requirements. *Id.* ¶ 21(d). He stated that he kept the purchases under $3,000 "to avoid leaving a paper trail that the plaintiffs in Valentine's lawsuit could track." *Id.* ¶ 21(e).

## B.    The Prior Judgment and Litigation Against Valentine

Valentine had indeed been involved in a California lawsuit -- LEPI had obtained a California Superior Court judgment against Valentine on November 28, 2007 for $195,073.56. *See* Block Decl. (Doc. No. 39) ¶ 9; Doc. No. 40 at 10. Costs of $30,531.94 were later awarded, increasing the judgment to $225,605.50. Doc. No. 39 ¶ 9. Additionally, on March 13, 2008, the California court awarded attorneys' fees of $145,142.50, bringing the total judgment against Valentine to $370,748. *Id.* ¶ 10; Doc. No. 42 at 13.

The circumstances of the California lawsuit brought by LEPI (and its principal, Block) in 2002 against Valentine are complex, and are beyond the scope

of this Order.  A few details, however, are important for present purposes.[5]

Valentine is Block's former girlfriend.  Doc. No. 39 at 2.  Allegedly, as part of that

relationship, starting in about 1996 she became an employee of LEPI and was paid

approximately $700,000 over a five-year period.  *Id.* at 2-3.  LEPI also lent her

money to buy a residence in Maui (which she purchased in her own name).  *Id.* at

3.  Valentine apparently spent much time in Hawaii during this period.  *Id.*

     In September 2002, LEPI and Block filed suit in a California Superior

Court against Valentine, seeking (1) damages for embezzlement and other claims,

and (2) a declaration that Block was the owner of LEPI and that Valentine had no

ownership interest in LEPI.  *Id.*  LEPI and Block were originally represented by

Kornhauser.  In November 2002, however, Kornhauser was disqualified from

representing LEPI after a receiver was appointed for LEPI.  *Id.* at 4.  Kornhauser

apparently represented Block individually during this period, and his claim in this

action to the Defendant Money Orders is based upon being their "third party

beneficiary" because of unpaid attorneys' fees.[6]  Doc. No. 44 ¶ 5.  The litigation

---

[5] The court draws these details regarding Valentine's involvement in prior litigation primarily from a February 20, 2011 Declaration of Block (Doc. No. 39), which the court assumes as true for purposes of this Motion.  *See* Supplemental Rule G(8)(c)(ii)(B) (indicating circumstances where summary judgment principles apply).

[6] As evidenced by a "secured promissory note" between Block and Kornhauser, Block owes a significant sum in attorneys' fees.  Doc. No. 44-2.  Kornhauser thus has an interest or claim against Block (but not against LEPI) for fees.

against Valentine lasted over five years, and Kornhauser was substituted back as counsel for LEPI on January 22, 2008. Doc. No. 39 at 4; Doc. No. 40 at 6.

As mentioned above, LEPI and Block prevailed, at least in part, in their suit against Valentine. LEPI obtained the November 28, 2007 judgment, and subsequent March 13, 2008 award of attorneys' fees. (The monetary awards were only in favor of LEPI; Block obtained declaratory relief but was not awarded damages or fees.) Doc. No. 39 at 5.

Valentine did not pay the November 28, 2007 judgment. Accordingly, on March 12, 2008, the California Superior Court entered an "Order in Aid of Execution" requiring Valentine to:

> assign to the judgment creditor [LEPI] to the extent necessary to pay and satisfy fully the judgment entered herein, . . . all right, title and interest held by judgment debtor Gail Valentine in any deposit account, trust account, brokerage account, certificate of deposit, or other type of bank account maintained by judgment debtor Gail Valentine, including Bank of America bank account No. [redacted] and any other type of account in the name of judgment debtor Gail Valentine as Gail Valentine Jones[.]

Doc. No. 44-3 at 2.

Block knew that Valentine owned real property in Maui and that she was apparently receiving rents from it. Notably, LEPI did not timely record the California judgment in Hawaii, and thus no judgment lien attached to the Maui

property.[7]  Doc. No. 39 at 5-6.  On April 28, 2008, however, the California

Superior Court issued a restraining order in the California action providing that

"pursuant to Code of Civil Procedure Section 708.520 . . . judgment debtor Gail

Valentine and any persons and entities acting for her or under her control or in

which she has an ownership interest are restrained from assigning or otherwise

disposing of the right to or use of payment from any rents."  Doc. No. 44-3 at 4-5.

The April 28, 2008 order, however, does not reference any specific property.

Similarly, on May 2, 2008, the California Superior Court entered a

"Supplemental Order Granting Motion for Assignment Order in Aid of Execution"

in the California action, providing in part:

> . . . . Valentine shall immediately assign to the judgment
> creditor [LEPI] . . . all right, title and interest held by
> [Valentine] in any rents including, but not limited to,
> rents from the property located at 2500 Kaupakalua
> Road, Haiku, Maui, Hawaii 96708, or any other rents
> paid or received by or on account in the name of
> [Valentine]
> . . . .
> . . . . [Valentine] or any entity she controls or has an
> ownership interest in shall immediately assign to [LEPI]

---

[7] LEPI and Block (through different counsel) eventually filed the California judgment in Hawaii pursuant to Hawaii's Enforcement of Foreign Judgments Act, Haw. Rev. Stat. Ch. 636C, on February 9, 2010 -- over two years after the judgment was issued, and four months after the Government had seized the Defendant Money Orders -- and the judgment was recorded in the Hawaii Bureau of Conveyances on February 11, 2010.  Doc. Nos. 8-3 & 8-4.  Block characterizes Kornhauser's failure to attach a judgment lien on Valentine's Maui property as malpractice.  Doc. No. 39 at 6.

> all right to any rent payment due or to become due from
> any aforementioned properties.
> . . . . [P]ursuant to Code of Civil Procedure Section
> 708.520, [Valentine] [is] restrained from assigning or
> otherwise disposing of the right to payment from any
> rents.

Doc. Nos. 42 at 22; 44-3 at 7.  By its terms, this Supplemental Order specifically

ordered Valentine to assign to LEPI any "right to rents" from her Maui property.

By this time, however, Valentine had sold the Maui property.  The

sale for $1 million had closed on May 1, 2008.  Doc. No. 42 at 17-19.  Block

asserts that the proceeds from this sale were used to purchase a majority of the

Defendant Money Orders as part of Valentine's scheme to avoid paying the

November 28, 2007 California judgment and subsequent attorneys' fees award.

Doc. No. 39 at 7.  According to Block, Valentine had no assets or funds other than

the Maui property.  He attests that "[Valentine's] lack of assets and her need for

money to live on was the reason that she was paid a 'salary' by [LEPI]."  *Id.*

As detailed above, Smith (presumably with Valentine's funds) had

begun buying USPS money orders on February 1, 2008.  Doc. No. 1 ¶ 16.  Smith

purchased fifty-one of the 279 money orders before May 1, 2008, and he bought

the rest from May 5, 2008 to December 12, 2008.  Doc. No. 1 Ex. A.  Thirty of the

fifty-one pre-May 1, 2008 money orders were seized.  *Id.*  Again, as alleged in the

Complaint, Smith stated that these purchases were done "as a way to help

[Valentine] to hide her money from people involved in that civil lawsuit."  Doc. No. 1 ¶ 21(c).

## C.    Procedural History

The USPIS seized the Defendant Money Orders on October 6, 2009. On April 5, 2010, the Government filed its Complaint for Forfeiture under 31 U.S.C. § 5317(c)(2) and 28 U.S.C. § 1345, *in rem*, against the Defendant Money Orders.  LEPI and Block filed a Verified Claim on June 7, 2010, followed by an Answer on June 25, 2010.  Kornhauser also filed a Verified Claim on June 7, 2010, and an Answer on June 28, 2010.  Neither Valentine nor Smith filed claims, and default was entered against both on July 8, 2010.  Doc. No. 13-6.  No other claims were made and default was subsequently entered against all other potential claimants on September 27, 2010.  Doc. No. 27-6.

On December 21, 2010, the Government filed the instant Motion to Dismiss or Strike the Claims and Answers and/or Motion for Summary Judgment. On February 18, 2011, Kornhauser filed a Declaration as his Opposition (without a supporting Memorandum).  On February 22, 2011, LEPI filed an Opposition.  The Government filed a Reply on March 2, 2011.  The Motion was heard on March 14, 2011.  After the hearing, the parties filed supplemental briefing, by letter or memorandum.

# III.  STANDARDS OF REVIEW

## A.    Supplemental Rules

Federal civil forfeiture proceedings are governed by the Supplemental Rules.  *See* 18 U.S.C. § 983(a)(4)(A); *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1117 (9th Cir. 2004).  Under the Supplemental Rules, "[a]t any time before trial, the government may move to strike a claim or answer . . . because the claimant lacks standing."  Supplemental Rule G(8)(c)(i)(B).  The motion to strike "may be presented as a motion for judgment on the pleadings or as a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence."  *Id.* G(8)(c)(ii)(B).  As explained by the 2006 Advisory Committee Notes to Supplemental Rule G:

> If a claim fails on its face to show facts that support claim standing, the claim can be dismissed by judgment on the pleadings.  If the claim shows facts that would support claim standing, those facts can be tested by a motion for summary judgment.  If material facts are disputed, precluding a grant of summary judgment, the court may hold an evidentiary hearing.  The evidentiary hearing is held by the court without a jury.  The claimant has the burden to establish claim standing at a hearing; procedure on a government summary judgment motion reflects this allocation of the burden.

Advisory Committee Notes to Rule G(8)(c)(ii).  Here, Plaintiff has presented its

Motion as a "Motion to Dismiss or Strike Claims and Answers . . . and/or for

Summary Judgment."  The court therefore applies standards for both a Rule 12(c)

Motion for Judgment on the Pleadings, and for a Rule 56 Motion for Summary

Judgment.[8]

**B.      Rule 12(c)**

In considering a Rule 12(c) motion, the court accepts as true all

factual allegations in the pleading being challenged, and construes them in the light

most favorable to the non-moving party.  *Fleming v. Pickard*, 581 F.3d 922, 925

(9th Cir. 2009).  A motion for judgment on the pleadings should be granted when

there are no disputed issues of material fact, and the moving party is entitled to

judgment as a matter of law.  *Id.*

Under *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), "[t]o survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'"  *Id.* at 1949 (quoting

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Ninth Circuit

---

[8]  The court applies the standards against the claimants' pleadings (Claims and Answers), assessing whether claimants have standing under both Rule 12(c) and Rule 56 standards.  *See, e.g.*, *United States v. All Assets Held at Bank Julius Baer & Co.*, 664 F. Supp. 2d 97, 104 (D. D.C. 2009) (applying Rule 56 standards in assessing whether claimant had standing); *United States v. Currency $716,502.44*, 2008 WL 5158291, at *2 (E.D. Mich. Dec. 5, 2008) ("The Supplemental Rules allow the government to move to dismiss, in accord with Federal Rule of Civil Procedure 12(c), a claim for . . .  lack of standing.").

recently confirmed that the *Iqbal* "plausibility" standard applies when analyzing a Rule 12(c) motion. *See United States ex rel. Cafasso v. General Dynamics C4 Systems, NVW Inc.*, --- F.3d ---, 2011 WL 1053366, at *4 n.4 (9th Cir. Mar. 24, 2011).

Accordingly, pursuant to *Iqbal*, the court analyzes whether the Claims here "contain sufficient factual matter, accepted as true," to state facially plausible claims. *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 at 570); *see also Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008). This tenet -- that the court must accept as true all of the allegations contained in the [pleading] -- "is inapplicable to legal conclusions." *Iqbal*, 129 S. Ct. at 1949. Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rather, "[a] claim has facial plausibility when [it] pleads factual content that allows the court to draw the reasonable inference," *id.* at 1949 (citing *Twombly*, 550 U.S. at 556), in this forfeiture context that the claim has validity and that the claimant has standing. "Factual allegations that only permit the court to infer "the mere possibility of [a claim]" do not show that the pleader is entitled to relief. *Id.* at 1950.

## C.     Rule 56

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

## IV. DISCUSSION

The Government argues that LEPI has no cognizable "ownership interest" in the Defendant Money Orders because it is only an unsecured creditor of Valentine. If so, LEPI has no statutory standing to make a claim to the Defendant Money Orders.[9] And Kornhauser's derivative claim would necessarily

_____

[9] At best, the Government implies, LEPI's remedy is through a remission process under 18 U.S.C. § 981(d) and 28 C.F.R. § 9 whereby the Attorney General may return forfeited assets to an owner, a lienholder, or a victim of the crime underlying the forfeiture if certain eligibility

(continued...)

fail.  The Government thus argues it is entitled to summary judgment as to

forfeiture of the Defendant Money Orders.  For the reasons set forth below, the

court agrees.

## A.    Forfeiture of Property "Involved in" or "Traceable to" Structuring

The Defendant Money Orders were seized under 31 U.S.C.

§ 5317(c)(2) as being involved in or traceable to a structuring offense.  Section

5317(c)(2) provides:

> Any property *involved in* a violation of section 5313,
> 5316, or 5324 of [title 31], or any conspiracy to commit
> any such violation, and any property *traceable to* any
> such violation or conspiracy, may be seized and forfeited
> to the United States in accordance with the procedures
> governing civil forfeitures in money laundering cases
> pursuant to section 981(a)(1)(A) of title 18, United States
> Code.

(Emphases added.)  In turn, 31 U.S.C. § 5324(a) provides in relevant part:

> Domestic coin and currency transactions involving
> financial institutions. -- No person shall, *for the purpose
> of evading the reporting requirements of section 5313(a)
> or 5325 or any regulation prescribed under such
> section* . . . (1) cause or attempt to cause a domestic
> financial institution to fail to file a report required under
> section 5313(a) or 5325 or any regulation prescribed
> under such section[;] . . . or (3) *structure or assist in
> structuring, or attempt to structure or assist in*

---

[9](...continued)
criteria are met.

> *structuring,* any transaction with one or more domestic
> financial institution.

(Emphases added). The reporting requirements at issue are found at 31 U.S.C.

§ 5325, and its corresponding regulations at 31 C.F.R. § 103.29 (effective prior to

February 28, 2011).[10] Under these requirements, a "financial institution" --

including the USPS[11] -- is prohibited from issuing certain monetary instruments,

including money orders, to any individual in connection with a transaction or

group of transactions involving $3,000 or more unless it (1) verifies the

purchaser's identity and (2) maintains certain records of, among other information,

the name, date, and amount of the purchase of the instrument. Under 31 C.F.R.

§ 103.29(b), "[c]ontemporaneous purchases of the same or different types of

instruments totaling $3,000 or more shall be treated as one purchase" and

"[m]ultiple purchases during one business day totaling $3,000 or more shall be

treated as one purchase[.]"

    "Structuring" in this context means "to break up a single transaction

---

[10] Under § 5324(a), § 5325 is a "reporting" requirement for these purposes (even if it primarily imposes "recording" responsibilities). Section 5325 is unlike § 5313 and its corresponding regulation 31 C.F.R. § 103.22(b)(1), which require filing (subject to certain exemptions) of currency transaction reports for transactions exceeding $10,000. In contrast, § 5325(b) requires reporting "at the request of" the Treasury Secretary.

[11] The United States Postal Service is a "financial institution" subject to the applicable reporting requirements. *See* 31 U.S.C. § 5312(a)(2)(V).

above the reporting threshold into two or more separate transactions -- for the purpose of evading a financial institution's reporting requirement." *Ratzlaf v. United States*, 510 U.S. 135, 136 (1994), *superceded by statute on other grounds*, Money Laundering Suppression Act of 1994, Pub. L. No. 103-325, § 411(a) & (c)(1), 108 Stat. 2160, *as recognized in United States v. Pang*, 362 F.3d 1187, 1193-94 (9th Cir. 2004). It is irrelevant "whether the cash at issue represents criminal or lawful proceeds." *United States v. MacPherson*, 424 F.3d 183, 193 (1st Cir. 2005).

To prove a criminal violation of § 5324, the Government must demonstrate "that a defendant had knowledge of the reporting requirements and acted to avoid them." *United States v. Van Allen*, 524 F.3d 814, 820 (7th Cir. 2008) (citations omitted). In doing so, the government is not required to prove knowledge that structuring is illegal. *Pang*, 362 F.3d at 1193 (reasoning that Congress excepted violations of § 5324 from the penalty provisions of 31 U.S.C. § 5322 which require "willfulness").

These provisions apply to the purchase of USPS postal money orders. *See, e.g.*, *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 72-73 (2d Cir. 2002) (reviewing forfeiture of numerous postal money orders as a result of involvement in structuring to avoid currency transaction reporting

requirements); *United States v. $11,552.73 in U.S. Currency*, 2009 WL 2045340, at
*4 (D. Mass. June 10, 2009) (same).

The Government has demonstrated that the Defendant Money Orders
were "involved in" or "traceable to" violations of 31 U.S.C. § 5324(a) for purposes
of 31 U.S.C. § 5317(c)(2). According to the uncontested allegations of the
Verified Complaint, Smith structured 279 transactions "for the purpose of evading"
requirements in 31 U.S.C. § 5325 and 31 C.F.R. § 103.29(b). That is, single
transactions above the reporting or recording threshold were broken up into two or
more separate transactions "for the purpose of evading a financial institution's
reporting requirement." *Ratzlaff*, 510 U.S. at 136. The Defendant Money Orders
were included within these 279 transactions. Doc. No. 1 ¶ 16. And Smith
admitted that he knew that buying money orders with amounts of cash over $3,000
triggered reporting requirements and that he made his purchases in such a way as
"to avoid leaving a paper trail." *Id.* ¶¶ 21(d) &(e).

Indeed, Claimants have admitted or not contested the essential facts
establishing the Government's right to forfeiture of the Defendant Money Orders.
*See* Answer of LEPI (Doc. No. 10) ¶¶ 1 & 2 (admitting that the Government
properly seized Defendant Money Orders and admitting ¶¶ 3-7 of the Verified
Complaint); LEPI's Response to Pl.'s CSF (Doc. No. 47) at 1-2 (not disputing the

first twelve statements of fact in Government's CSF); Kornhauser's Separate Statement of Disputed Facts (Doc. No. 45) at 1-3 (not disputing essential facts establishing Government's right to forfeiture). Rather, LEPI and Kornhauser assert they have "ownership interests" in the Defendant Money Orders and seek to make claims in the funds. The Government disagrees and thus moves to strike the remaining Claims for lack of standing.[12]

## B.      Standing to Make a Claim in Forfeited Property

As in any federal case, Article III standing is a threshold determination in forfeiture cases. *See United States v. Real Property Located at 5208 Los Franciscos Way*, 385 F.3d 1187, 1191 (9th Cir. 2004). "In a forfeiture case, a claimant's Article III standing turns on whether the claimant has a sufficient ownership interest in the property to create a case or controversy." *United States v. $4,224,958.57 (Boylan)*, 392 F.3d 1002, 1005 (9th Cir. 2004) (citation omitted). "This burden is not a heavy one, at least at the initial stages of a forfeiture suit." *United States v. Real Property Located at 475 Martin Lane*, 545 F.3d 1134, 1140 (9th Cir. 2008). "A 'claimant need demonstrate only a colorable interest in the property, for example, by showing actual possession, control, title, or financial stake.'" *Id.* (quoting *5208 Los Franciscos Way*, 385 F.3d at 1191). "[The]

---

[12] As noted earlier, Block has withdrawn his Claim. *See* Doc. No. 46 at 1 n. 1.

ownership interest is determined under the law of the state in which the interest arose[.]" *5208 Los Franciscos Way*, 385 F.3d at 1191.

Although the burden of demonstrating a colorable ownership interest is "not a heavy one," *475 Martin Lane*, 545 F.3d at 1140, "federal courts have consistently held that unsecured creditors do not have standing to challenge the civil forfeiture of their debtors' property." *United States v. $20,193.39 in U.S. Currency*, 16 F.3d 344, 346 (9th Cir. 1994). "Unlike secured creditors, general creditors cannot claim an interest in any particular asset that makes up the debtors' estate." *Id.* An "owner" is defined as "a person with an ownership interest *in the specific property* sought to be forfeited[.]" 18 U.S.C. § 983(d)(6)(A) (emphasis added). Indeed, by statute, unsecured creditors are specifically *excluded* from the definition of an "owner." *See* 18 U.S.C. § 983(d)(6)(B)(i) ("[T]he term 'owner' . . . does not include . . . a person with only a general unsecured interest in, or claim against, the property or estate of another[.]"). Numerous cases agree with this well-established principle of forfeiture law. *See, e.g.*, *United States v. $9,250.00 in U.S. Currency*, 2010 WL 3168628, at *4 (D. Ariz. Aug. 10, 2010) (citing cases); *United States v. One-Sixth Share*, 326 F.3d 36, 44 (1st Cir. 2003); *United States v. Watkins*, 320 F.3d 1279, 1283-84 (11th Cir. 2003); *United States v. Real Property Located at 730 Glen-Mady Way*, 590 F. Supp. 2d 1295, 1301

(E.D. Cal. 2008); *United States v. McCorkle*, 143 F. Supp. 2d 1311, 1319-20 (M.D. Fla. 2001) (citing cases).

Here, it is undisputed that LEPI is -- at least under Hawaii law -- an unsecured, general creditor of Valentine. As the Government points out, LEPI bases its Claim to the Defendant Money Orders solely on the November 28, 2007 California judgment against Valentine (and subsequent Orders in Aid of Execution). Kornhauser's claim is, at best, derivative of LEPI's as it is based on a "secured promissory note" he has with Block. That is, neither LEPI nor Kornhauser ever possessed the Defendant Money Orders. They didn't buy them; they never touched them. Their Claims are based solely on being able to trace the proceeds from the sale of Valentine's Maui property into the Defendant Money Orders.

Block (LEPI's CEO) admits, as he must, that LEPI failed to create a lien on Valentine's Maui property by failing to record the California judgment prior to the sale. *See* Haw. Rev. Stat. § 636-3 ("Any [foreign] money judgment, order, or decree of a state court . . . shall be a lien upon real property when a [certified] copy . . . is recorded in the bureau of conveyances."). The November 28, 2007 California judgment was not recorded in Hawaii until February 11, 2010. *See* Doc. Nos. 8-3 & 8-4. This was over two years after the judgment was entered

in California and nearly two years after Valentine sold the Maui property. It was

also four months after the Government seized the Defendant Money Orders. Block

blames Kornhauser, attesting in relevant part:

> Kornhauser [as LEPI's counsel from January 22, 2008]
> did nothing to create a Hawaii[] judgment-lien against the
> Maui property from January 22, 2008 forward.
> Kornhauser did nothing to record the judgment against
> the property in the Hawaii[] Bureau of Conveyances, or
> to file the judgment with the Hawaii[] courts as a sister
> state judgment -- two simple procedures available in
> almost every state to create a security interest in a
> judgment-debtor's real property.

Doc. No. 39 ¶ 11. Under binding law, then, it necessarily follows that LEPI -- as

an unsecured creditor -- does not have standing to challenge the forfeiture of

Valentine's property (assuming the Defendant Money Orders were purchased

solely from the proceeds of the sale of the Maui property).[13] *See $20,193.39 in*

*U.S. Currency*, 16 F.3d at 346. LEPI "cannot claim an interest" in the Defendant

Money Orders. *Id.* And thus Kornhauser -- whose claim is entirely derivative --

also cannot claim an interest.

LEPI argues there is at least a question of fact that it had an

ownership interest in the Defendant Money Orders, given (1) the California

---

[13] At best, LEPI's theory would only allow partial recovery because it is undisputed that fifty-one of the 279 money orders that Smith bought were purchased *before* the sale of the Maui Property (and thirty of those fifty-one were seized). Doc. No. 1 Ex. A. Those thirty could not have been bought with proceeds of the sale of the Maui property.

Superior Court's Restraining Order of April 28, 2008, precluding Valentine from "disposing of the right to or use of payment from any rents," Doc. No. 44-3 at 5, as well as (2) the May 2, 2008 "Supplemental Order . . . in Aid of Execution" requiring Valentine to assign to LEPI "all right, title and interest . . . in any rents." Doc. No. 42 at 22.[14] Even assuming, however, that Valentine wrongly "disposed of" a "right to payment from any rents" by selling the Maui Property, LEPI would still only have an unrecorded ownership interest against the Maui Property, and not in the Defendant Money Orders themselves.

## C.    The Possibility of a Constructive Trust

Nevertheless, the court has considered the possibility that, under constructive trust principles, LEPI could have an equitable ownership interest in the Defendant Money Orders so as to have standing. And in limited circumstances, Ninth Circuit precedent allows a beneficiary of a constructive trust to have Article III standing to make a claim for forfeited property. *See Boylan*, 392 F.3d at 1005 (holding that a beneficiary of a constructive trust -- where seized assets constituted the actual proceeds of criminal conduct -- can have a sufficient ownership interest to have Article III standing in forfeiture proceedings). Almost

---

[14] As explained earlier, the May 2, 2008 Supplemental Order appears to have come too late -- Valentine had already sold the Maui Property.

24

all circuits have recognized that, in appropriate situations, a constructive trust theory can provide at least Article III standing to challenge a forfeiture. *See, e.g.*, *United States v. Shefton*, 548 F.3d 1360, 1365 (11th Cir. 2008) ("We agree with the large majority of courts that have determined (1) that a constructive trust, despite being an equitable remedy, constitutes a 'legal right, title, or interest in . . . property' . . . and (2) that a constructive trust can render a forfeiture order invalid[.]") (citing cases). *Shefton* recognized that "[o]nly one circuit court has concluded that a constructive trust cannot invalidate a forfeiture order." *Id.* (citing *United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185, 1190-91 (D.C. Cir. 1995)).

Under Hawaii law,[15] "[a] constructive trust arises where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Seo Jeong Won v. England*, 2008 WL 5225872, at *5 (D. Haw. Dec. 12, 2008) (citing *Kam Oi Lee v. Fong Wong*, 57 Haw. 137, 139, 552 P.2d 635, 638 (1976)). "[T]he beneficial owner, in equity, has the right to have the title to the property transferred to himself if it is in the hands of the wrongdoer." *Id.* (citing *Peine v.*

---

[15] "State law determines whether Claimants have a property interest, but federal law determines whether or not that interest can be forfeited." *United States v. Hooper*, 229 F.3d 818, 820 (9th Cir. 2000) (citing *United States v. Lester*, 85 F.3d 1409, 1412 (9th Cir. 1996)).

*Murphy*, 46 Haw. 233, 241, 377 P.2d 708, 713 (1962)).  These broadly-stated standards allow a court, where necessary, to order equitable relief to avoid unjust enrichment.

At first glance, recognizing an equitable interest for LEPI seems plausible.  The Government's Verified Complaint itself seems to indicate that the Government knew at least some of the Defendant Money Orders were purchased with funds that should have been used to pay LEPI's judgment.  According to the Complaint, the motivation for the structuring was "to hide [Valentine's] money" and "to avoid leaving a paper trail that [LEPI] could track."  Doc. No. 1 ¶¶ 21(b) & (e).  It appears the Government was able to seize the Defendant Money Orders because of Smith's (or Valentine's) wrongdoing to LEPI.  It is possible that Valentine will have succeeded (in avoiding paying LEPI) precisely because of the Government's seizure.

Upon closer scrutiny, however, the court concludes that LEPI has no equitable interest in the seized funds.  Even with the wide discretion given to courts under Hawaii constructive trust principles, such relief is not proper here.

Initially, *Boylan* does not apply.  Unlike *Boylan*, where the seized assets constituted the specific proceeds of criminal conduct, 392 F.3d at 1003-04, no such direct tracing to criminally derived proceeds is possible here.  LEPI was

not a "victim" of the structuring, and at least some of the seized assets could not have come from the sale of the Maui property.[16]

Even assuming LEPI was a "victim" of Valentine's failure to pay LEPI's judgment, the Defendant Money Orders were seized because they were "involved in" "structuring" to evade a "reporting requirement" -- not because of Valentine's failure to pay LEPI. And even if Valentine's (or Smith's) motivation for structuring was to hide money from LEPI, it does not mean LEPI is a "victim" of the structuring. In fact, under 31 U.S.C. § 5324, the Government is not required to prove a motivation at all. The Defendant Money Orders would be forfeitable regardless of Valentine's motive -- whether it was to avoid paying a secured creditor, an unsecured creditor, or to avoid paying a gambling debt. The motivation is irrelevant. Rather, the question is whether a claimant has an identifiable interest in the specific property seized.

Further, even assuming the California post-judgment orders could give LEPI an equitable interest in the Maui property, *the Maui property* was not seized -- the Defendant Money Orders were. LEPI would still have to trace the

---

[16]  Aside from these factual differences, the court in *Boylan* also faced a situation where the Government itself had unclean hands -- it had obtained the funds by repatriation from a foreign government representing it would seek to return the funds to the victims after prosecution or forfeiture, only to seek default in the forfeiture proceeding without providing notice to the victims.  392 F.3d at 1003-04.

proceeds of Valentine's sale of the Maui property. It would have to trace sale proceeds to Valentine, then to Smith, and then into the Defendant Money Orders. But Block himself indicates that Valentine may have had other funds (besides proceeds of the sale) -- such as rents from the Maui property and "$700,000 in salary from LEPI over the previous five years" -- with which to purchase the Defendant Money Orders. And thirty of the seized money orders were purchased *before* the sale. Tracing would be speculative -- and so a constructive trust is inappropriate. *Cf. United States v. One Silicon Valley Bank Account*, 549 F. Supp. 2d 940, 955 (W.D. Mich. 2008) ("The recognition of a constructive trust requires that the money or property on which the trust is imposed must be 'clearly traced' to the beneficiary of the constructive trust.") (Michigan law); *United States v. Rothstein*, 2010 WL 2943315, at *4 (S.D. Fla. July 26, 2010) (refusing to impose a constructive trust in forfeited properties where victims of a Ponzi scheme could not trace their monies to the specific properties); *Wery v. Pac. Trust Co.*, 33 Haw. 701, 1936 WL 4399, at *7 (Haw. Terr. 1936) ("In a purchase-money constructive trust the money used must be traceable to the trust *res*[.]").

Moreover, under the circumstances the court faces here, the court would refuse to impose a constructive trust based on other equitable principles. LEPI is hardly blameless. *See Adair v. Hustace*, 64 Haw. 314, 320 n.5, 640 P.2d

294, 300 n.5 (1982) ("He who seeks equity must do equity") (citation omitted).

Under the doctrine of laches, a court may deny an equitable remedy (such as

imposition of a constructive trust) where the party seeking equity unreasonably

delayed matters. *See Small v. Badenhop*, 67 Haw. 626, 640, 701 P.2d 647, 656-57

(1985). Here, LEPI could have perfected a judgment lien in Valentine's Maui

property by recording the California judgment in Hawaii's Bureau of Conveyances

before the sale. LEPI, however, simply waited too long to record the judgment.

Imposing a constructive trust in the (alleged) proceeds of the sale now by allowing

a claim in the Defendant Money Orders would reward LEPI for its delay. *See

generally $9,250.00 in U.S. Currency*, 2010 WL 3168628, at *5 (refusing to

impose a constructive trust to allow a general, unsecured creditor standing to file a

claim challenging a forfeiture, in the absence of actual or constructive fraud);

*United States v. Andrews*, 530 F.3d 1232, 1238-39 (10th Cir. 2008) (recognizing in

a forfeiture case that "when a district court determines that granting relief upon an

equitable theory such as constructive trust would lead to an inequitable result, it

may in its discretion decline to do so") (citations omitted).

Finally, the court follows the principle that a constructive trust is

unnecessary where alternative legal remedies are available. *See, e.g.*, *United States

v. Approximately $133,803.53 in U.S. Currency Seized from Washington Mutual

29

*Bank*, 683 F. Supp. 2d 1090, 1095-96 (E.D. Cal. 2010) (reasoning that a

constructive trust is not necessary where a potential remedy is available under a

remission process under 18 U.S.C. § 983(d) and 28 C.F.R. § 9.8); *United States v.*

*Ribadeneira*, 105 F.3d 833, 837 n.5 (2d Cir. 1997) (indicating that remission

process is an adequate remedy at law obviating the need for an equitable remedy of

a constructive trust); *United States v. Lavin*, 942 F.2d 177, 185 (3d Cir. 1991)

("For the majority of third parties . . . who assert an equitable, rather than a legal,

entitlement to relief, petitioning the Attorney General for remission and mitigation

remains the exclusive remedy.").[17]

      In short, a constructive trust theory does not provide LEPI with an

interest in the Defendant Money Orders.

---

[17] Stated alternatively, the potential availability of remission for victims means such claimants lack prudential standing because they are not "within the zone of interest Congress intended to protect within [the] civil forfeiture proceeding." *Approximately $133,803.53 in U.S. Currency*, 683 F. Supp. 2d 1090, 1095 (E.D. Cal. 2010). Victims have the remission process. Under 8 C.F.R. § 9.8, certain "victims" of "an offense underlying the forfeiture of property, or of a related offense, who do not have a present ownership interest in the forfeited property" may seek remission. In general, courts should be careful in imposing constructive trusts in this forefeiture context -- recognizing claims of general creditors and litigating potentially conflicting claims of victims and owners to seized assets "convert[s] the forfeiture action into something akin to a bankruptcy proceeding." *Id.* at 1096. Doing so conflicts with the remission process. To be clear, the court offers no opinion as to whether LEPI could qualify to seek remission. But the arguments that LEPI is a "victim" of Valentine's wrongdoing, and thus of the structuring, should not be made to this court. And, aside from the remission process, as Block himself argues, LEPI recognizes it has a potential legal remedy with a malpractice action against Kornhauser.

# V.  CONCLUSION

Because LEPI is an unsecured general creditor of Valentine, the court must strike its Claim to the Defendant Money Orders for lack of standing.  *See $20,193.39 in U.S. Currency*, 16 F.3d at 346.  It cannot be an "owner."  18 U.S.C. § 983(d)(6)(B)(i).  And a constructive trust theory does not apply to give LEPI a sufficient equitable interest so as to make a claim.  Striking LEPI's Claim means Kornhauser's Claim (which is entirely derivative) necessarily fails as well. Further, the Government has proven that it is otherwise entitled to forfeiture of the Defendant Money Orders.

Accordingly, the Government's Motion to Dismiss or Strike Claims and Answers filed by Life Enhancement Products, Inc., Will Block, and Samuel Kornhauser and/or Motion for Summary Judgment [Doc. No. 30] is GRANTED. Because the Government is otherwise entitled to forfeit the Defendant Money Orders, and default has been entered specifically as to Valentine and Smith, and as to any other potential claimant, *see* Doc. Nos. 13-6 & 27-6, the Government is

//

//

//

//

entitled to summary judgment on its forfeiture action.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 28, 2011.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*United States v. One Hundred Thirty Three U.S. Postal Serv. Money Orders*, Civ. No. 10-00200
JMS-RLP, Amended Order Granting Plaintiff's Motion to Dismiss or Strike And for Summary
Judgment